**UNITED STATES of America,**
**v.**
**Leon J. LEWIS, Defendant.**
**No. 67 Cr. 2.**

United States District Court
S. D. New York.
July 28, 1967.

See also D.C., 266 F.Supp. 897.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for the United States, by Stephen F. Williams, Asst. U. S. Atty., New York City.

Herbert B. Greene, New York City, for defendant.

MANSFIELD, District Judge.

Pursuant to the Court's decision dated June 16, 1967, D.C., 270 F.Supp. 807, a hearing was held on June 29, 1967, at which the parties offered evidence with respect to the defendant's motion pursuant to Rule 41(e), F.R.Crim.P., for suppression of evidence consisting of an alcohol still and related apparatus seized on December 15, 1966, by agents of the Federal Bureau of Investigation from the defendant's apartment. Witnesses appearing at the hearing included the defendant and Agents Donald Bullard, George McNeil, Robert Marble and William H. Billups. After observing the witnesses testify and appraising their credibility, the Court finds facts with respect to the search and seizure to have been as follows:

On the afternoon of December 15, 1966, the four aforementioned FBI agents, who were members of that Bureau's Fugitive Squad, armed with a warrant for the arrest of the defendant for violation of parole, lawfully arrested him as a parole violator near the corner of Park Avenue and 118th Street, New York, N. Y., after the defendant had exited from Apartment A of a building at 1686 Park Avenue, the entrance to which was located about 30 feet from the spot on the street where the arrest was made.

Upon arresting the defendant the agents identified themselves as law enforcement officers, placed the defendant under arrest as a parole violator, handcuffed him, advised him fully of his Fifth and Sixth Amendment rights, and then frisked him, removing from his clothing the key to the aforementioned apartment. The arresting officers suspected that the defendant might be illegally operating a still at his apartment for the reason that he had previously been convicted for various crimes, including illegal operation of a still. However, they did not have a warrant for the search of his premises nor did they have probable cause for making such a search, or for obtaining a warrant. Upon arresting the defendant Agent Bullard suggested to the defendant that they wanted to search the apartment for the reason that if he had a still in operation there it might explode, since the defendant would not be released on bail after arrest for violation of parole and would not therefore be permitted to return to the premises to shut off any still that might be there. In response to Agent Bullard's statement, defendant replied "Sure" or "OK", but simultaneously stated that he did not have any still cooking in his apartment. At that point Agent McNeil left the group and proceeded toward the defendant's apartment at 1686 Park Avenue, followed by Agent Marble.

In the meantime one of the two agents remaining with the defendant suggested that they go to the defendant's apartment. At that point the defendant started away from the direction of 1686 Park Avenue toward 118th Street, whereupon the agent said that the defendant lived at 1686 Park Avenue, to which Lewis replied "No". The agents then told him that they knew he lived at the latter address. The defendant shrugged his shoulders and was escorted to his apartment. By the time the defendant and the remaining agents reached the defendant's apartment, Agents McNeil and Marble had entered the defendant's apartment, using the key taken from the defendant at the time of his arrest, and they there found a still in operation along with related apparatus and metal barrels containing fermenting materials. The still was turned off and in the course of the visit the defendant demonstrated to the agents how the still was operated, expressing some pride in his skill and accomplishments in this area.

At no time during the period from the arrest until the serach of the apartment did any of the agents advise the defendant of his Fourth Amendment rights or that if he consented to their searching

his apartment, anything found therein could be used against him.

◼ In the acknowledged absence of a search warrant, the search of the defendant's apartment and the seizure of the still and other apparatus found therein, would be lawful only if made with the defendant's consent. The Government does not contend that probable cause existed for the entry and seizure without a warrant. Nor do the circumstances indicate that the search was incident to the arrest of the defendant. The warrant for his arrest as a parole violator was executed on the street, and he was arrested there, some 30 feet from the entrance to the multi-family dwelling in which his subsequently searched apartment was located. It was unnecessary to conduct a search of his apartment for the purpose of executing the warrant. The search cannot, therefore, be upheld on the strength of authorities permitting a search incident to an arrest for the purpose of locating and seizing things connected with the crime for which the defendant is arrested, e. g., Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); United States v. Rabinowitz, 339 U.S. 56, 70, 70 S.Ct. 430, 94 L.Ed. 653 (1949); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1935). The defendant was not arrested because of his operation of an illegal still or the conduct of any other illegal activity in his nearby apartment, but solely as a parole violator, based upon his failure to report.

◼ The search must therefore stand or fall on whether it was consented to by the defendant. The defendant could, of course, waive his personal right under the Fourth Amendment to be free from any warrantless search of his apartment. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); but the burden is upon the Government to show that he gave a valid and effective consent to such a search. Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951). Although the Supreme Court has recently prescribed the specific warning and advice that must be given to a defendant before he may effectively waive his Fifth and Sixth Amendment rights, see Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), there has so far been no similar condition precedent established for a valid waiver of Fourth Amendment rights. But see Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Colum.L.Rev. 130 (1967). In any event the Government here concedes that to be considered voluntary and effective a consent to search must be unequivocal, specific and intelligently given; that conduct which is two-faced, vague, or the product of coercion or trickery, actual or implicit, is ineffective, United States v. Thompson, 356 F.2d 216 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966); United States v. Smith, 308 F.2d 657, 663 (2d Cir.), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963); and that "consent to a search is not to be lightly inferred". United States v. Viale, 312 F.2d 595 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); United States v. Como, 340 F.2d 891 (2d Cir. 1965); United States v. Alberti, 120 F.Supp. 171, 174 (S.D.N.Y. 1954). Furthermore such a consent must be established by "clear and convincing evidence", United States v. Gregory, 204 F.Supp. 884 (S.D.N.Y. 1962).

◼ Among the factors that may be considered in determining the effectiveness and validity of a consent to search are whether at the time when it was given the defendant was under arrest, Judd v. United States, supra; United States v. McCunn, 40 F.2d 295 (S.D.N.Y. 1930); whether he was overpowered by arresting officers, handcuffed, or similarly subject to physical restrictions, e. g., United States v. McCunn, supra; People v. Zazzetta, 27 Ill.2d 302, 189 N.E.2d 260 (1963); whether the keys to the premises searched had already been seized by the police from the defendant, e. g., United States v. Fowler, 17 F.R.D. 499 (D.Calif. 1955); People v. Porter,

37 Misc.2d 73, 236 N.Y.S.2d 162 (Sup.Ct. Queens County 1962); whether the defendant employed evasive conduct or attempted to mislead the police, Castaneda v. Superior Court, 59 Cal.2d 439, 30 Cal.Rptr. 1, 380 P.2d 641 (1963, per Justice Traynor); and whether he denied guilt or the presence of any incriminatory objects in his premises, e. g., United States v. Gregory, supra; United States v. Kidd, 153 F.Supp. 605 (D.La. 1957); United States v. Wallace, 160 F.Supp. 859 (D.Colo. 1958).

■■ The presence of some or all of the aforementioned factors is not controlling, since (as the Government concedes) each case "must stand or fall on its own special facts", United States v. Dornblut, 261 F.2d 949, 950–951 (2d Cir.), cert. denied 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959). These factors, however, are probative indicia on the issue of whether a purported consent is valid and effective. Although the defendant need not express a "positive desire" to have the search conducted in order to render his consent a voluntary waiver, United States v. Thompson, supra, 356 F.2d at p. 220, it must amount to more than mere submission or acquiescence in the nature of resignation to constitute a valid waiver. United States v. Alberti, supra; United States v. Sully, 56 F.Supp. 942 (S.D.N.Y. 1944).

■ The Court here accepts as credible the testimony of the agents of the Federal Bureau of Investigation. Accepting that testimony, however, the defendant's conduct did not meet the foregoing standards or amount to a consent of the type recognized as sufficient. His acquiescence in the search proposed by the agents was at best equivocal. It could hardly be characterized as freely or voluntarily given. He was under arrest, handcuffed and surrounded by four arresting officers at the time when he was asked whether he would agree to the search. They had already frisked him and removed from him the key to his apartment, which undoubtedly was construed by him as indicating that they were in any event going to search his apartment, provided they could locate it. Apparently in the hope of dissuading them from making the proposed search, he coupled his acquiescence with a denial of possession of a still in his apartment and then attempted, when one of the agents said "Let's go to your apartment", to lead the agents in a direction away from where his apartment was actually located, i. e., toward 118th Street instead of 1686 Park Avenue. Certainly the defendant had every motive to avoid, if possible, a search of his apartment, since he knew that there was an illegal still being operated by him there, which, if found by the agents, would be strong evidence of guilt of a crime separate and apart from the violation of parole for which he was arrested, and which could upon conviction result in a heavy sentence.

Whether or not the defendant's conduct is characterized as bluff or "false bravado", see Judd v. United States, supra, it hardly evinces an unequivocal intent, freely given, that the officers might go ahead and search his apartment without first procuring a warrant. The situation here is parallel to that in United States v. Gregory, supra; and Judd v. United States, supra, where the consent was deemed insufficient on the basis of evidence which, if anything, was stronger than that here. In *Gregory*, for instance, the defendant was arrested in front of his apartment and asked if he had any more "stuff" inside, to which he replied "You can look if you like". In holding the purported consent insufficient, the Court stated:

"[A] defendant at once denying that narcotics are in his room and at the same time agreeing to a search which obviously must yield narcotics—is not in accord with common experience.
\* \* \*
"Further, even if the agents' version be accepted, acquiescence which is resignation—a mere submission in an orderly way to the actions of arresting agents—is not that consent which constitutes an unequivocal, free and in-

telligent waiver of a fundamental right."

There remains the question of whether at the time of the search the defendant, as a parolee, was entitled to assert his Fourth Amendment rights. A parolee, of course, enjoys his freedom on parole as a matter of grace rather than of right, having been committed by the Court to the custody of the Attorney General pursuant to a conviction and sentence. He remains "in the legal custody and under the control of the Attorney General", 18 U.S.C. § 4203(a). Having been found guilty of a violation of laws enacted for the protection of society, his release may in many cases represent a calculated risk to the community, taken by the Attorney General in the hope of effectuating his rehabilitation or reintroduction to a lawful existence. He is subject to broad supervisory and visitorial powers and may be summarily returned to prison upon violation of the conditions of his parole.

Before being released on parole, the defendant here signed a statement of "Conditions" under which he was released, which included, among other things, the following:

"The following conditions are to become operative immediately:

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"2. That I will commit no crime.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"4. That I will, between the first and third days of each month, and on the final day of my sentence, make a full and truthful written report to the Probation Officer, upon the form provided for that purpose and that I will submit each such report first to my Parole Advisor, if I have one, for certification and then mail or deliver same to my United States Probation Officer.

"5. That I will work regularly at a lawful occupation and support my dependents, if any, to the best of my ability. When out of work I will notify my Probation Officer at once.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"7. That I will promptly and truthfully answer all inquiries directed to me by the United States Board of Parole or by the United States Probation Officer.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"I further understand that my continuance under supervision rests in the discretion of the United States Board of Parole and that if I do not demonstrate capacity and willingness to fulfill the obligations of a law-abiding citizen, or if my continuance under supervision becomes incompatible with the welfare of society, I may be retaken on a warrant issued by the Board of Parole and reimprisoned pending a hearing to determine if my mandatory release should be revoked.

"I have read or had read to me, the foregoing conditions governing my release. I fully understand them and I will abide by and strictly follow them. I also understand that if I violate them in any manner I may be recommitted.

/S/   Leon J. Lewis                                    86946–A
────────────────────────────────────────────────
(Signature)   Leon J. Lewis                   (Register No.)"

Some have taken the view that the ubiquitous parole officer is entitled to make a summary, warrantless search of the parolee's premises for the purpose of determining whether he is complying with his agreement, provided the search is reasonable in scope. People v. Randazzo, 15 N.Y.2d 526, 254 N.Y.S.2d 99, 202 N.E.2d 549 (1964), cert. denied, 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed.2d 725 (1965); People v. Chinnici, 51 Misc.2d 570, 273 N.Y.S.2d 538 (1966); People v. Denne, 141 Cal.App.2d 499, 297 P.2d 451 (1956). Such searches and seizures have been justified not only on grounds of waiver but as essential to the protection of society against a convicted criminal who would otherwise be incarcerated. People v. Denne, supra.

■ If the Attorney General chose to hold a defendant in jail instead of permitting him to be released on parole, it is doubtful that the defendant would be entitled to invoke his Fourth Amendment rights to bar the search of his cell or personal effects. On the other hand, he undoubtedly could avail himself of Fifth Amendment rights to refuse to answer incriminatory questions, whether or not they related to current or past activities. See United States v. Shillitani, 2 Cir., 345 F.2d 290, 293, vacated and remanded on other grounds, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Since the parole officer has the right to investigate and interrogate a parolee for the purpose of determining whether he is living up to his conditions of parole and the parolee is obligated to respond to questions relating to possible violations of parole, it could be argued that the parolee should have no greater Fourth Amendment rights than he would have in a jailhouse cell. This Court, however, does not believe that a parolee can thus generally be stripped of his Constitutional rights, particularly since the effect of such a holding would be to expose him to self-incrimination and to surrender of his privacy with respect to matters and offenses other than violation of parole. In the present case, for instance, to uphold the search would be to expose him to prosecution and conviction for a new crime. Accordingly, the Court concludes that in the absence of an effective consent to the entry of his apartment, the defendant here was entitled to be protected against such search and seizure under the Fourth Amendment. See United States v. Hallman, 365 F.2d 289 (3d Cir. 1966); Brown v. Kearney, 355 F.2d 199 (5th Cir. 1966); Martin v. United States, 183 F.2d 436 (4th Cir.), cert. denied, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950).

For the foregoing reasons the defendant's motion to suppress the evidence obtained as a result of search and seizure of his apartment at 1686 Park Avenue, New York, N. Y., on December 15, 1966, is granted.

So ordered.